

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

September 1, 2020

**BY ECF**

The Honorable Cathy Seibel
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

**Re: *United States v. Marcus Stroud,***
**17 Cr. 320 (CS)**

Dear Judge Seibel:

The Government respectfully submits this letter in the above-captioned matter in opposition to the motion of Marcus Stroud for release pursuant to 18 U.S.C. § 3582 (Docket No. 33 ("Def. Mot.")). For the reasons set forth below, the defendant's request is without merit. Accordingly, the motion should be denied.

## I. Background

A. The Offense Conduct

On or about February 22, 2016, a 13-year-old victim ("Victim-1") contacted the Clarkstown Police Department ("CPD") in Rockland County, New York concerning sexual abuse by Marcus Stroud, the defendant. Victim-1 advised that he met Stroud in or about late December 2015 at a youth wrestling tournament in Rockland County, New York. Victim-1 provided his cell phone number to Stroud at Stroud's request, and they became "friends" on Instagram and SnapChat. (PSR ¶ 7; Complaint 4).

Thereafter, Vicitm-1 received a request on SnapChat from a SnapChat user ("Pug") with the account name "thechsenpug." Pug sent Victim-1 approximately ten nude photos of a female and asked Victim-1 to send nude photos in return. Victim-1 sent Pug several nude photos and several videos of Victim-1 stroking his penis. Pug told Victim-1 that Pug would release Victim-1's pictures on social media unless Victim-1 videotaped himself performing "oral sex on a black guy." Victim-1 refused and blocked Pug on SnapChat. Thereafter, another SnapChat user ("Princess") with the user name "sweedprincess" contacted Victim-1. Princess claimed to be a friend of Pug. (PSR ¶¶ 9, 10; Complaint ¶¶ 4(b), 4(c)).

In early January 2016, Stroud contacted Victim-1 via SnapChat and told Victim-1 that he had come across naked pictures of Victim-1 on Instagram but the pictures had since been deleted. Stroud told Victim-1 that he was good at computers and could help Victim-1. Victim-1 told Stroud about his sending of photos to Pug. Stroud told Victim-1 that he would reach out to Pug and would also put an "alert" on the pictures so that Stroud would be notified when the pictures were uploaded to the Internet. Stroud told Victim-1 that Stroud would be willing to perform the sexual act with Victim-1 to prevent the photos from being released. Victim-1 told Stroud that he did not want to perform the sexual act. (PSR ¶¶ 11; Complaint ¶ 4(d)).

On or about February 14, 2016, Victim-1 saw Stroud at a youth wrestling tournament in Rockland County, New York. Stroud asked Victim-1 when and where they would engage in the sexual act. Victim-1 repeated that he did not want to engage in a sexual act with Stroud. Stroud told Victim-1 that, if he wouldn't do the sexual act, Stroud did not care if Victim-1 was exposed. (PSR ¶ 12; Complaint 4(e)).

On or about February 20, 2016, Stroud sent a text message via SnapChat to Victim-1. Stroud told Victim-1 that he had been notified that nude photos of Victim-1 had been posted on an online web page. Stroud told Victim-1 that he had been able to delete the photos. Stroud told Victim-1 that he was also notified that the photos had been sent to two different phone numbers. Stroud asked Victim-1 when they would do the sexual act and told Victim-1 that they should just do it and get it over with. Victim-1 agreed to meet Stroud near Victim-1's house in Rockland County, New York. (PSR ¶ 13; Complaint ¶ 4(f)).

Approximately one hour later, Stroud met with Victim-1 at the designated location. Victim-1 and Stroud engaged in sexual activity. Stroud used his Apple iPhone 5c to videotape the sexual activity. (PSR ¶ 14; Complaint ¶ 4(g)). Later that day, Stroud communicated with Victim-1 via SnapChat texts and told Victim-1 that he would send the video to the female who had contacted Victim-1 and that he would put a virus on the video so that, when she opened the video, Stroud could take control of her phone and delete Victim-1's photos. Stroud then told Victim-1 that the video had been opened and Stroud had control over her phone. Stroud told Victim-1 that he would not delete the pictures. (Complaint ¶ 4(h)).

On or about February 21, 2016, Victim-1 received a SnapChat text from Princess. Princess said that she liked the video a lot and wanted to know if Victim-1 would make another. (PSR ¶ 16; Complaint ¶ 4(i)).

In late February, 2016, Victim-1's parents were notified by the mother of one of Victim-1's friends that the mother had received a photo of Victim-1 via a text from an unknown number. The photo appeared to be a nude photo of Victim-1 with the genital area blacked out. Ultimately, following his parents' discovery of that texted photo, Victim-1 told his parents and the police about the events involving Marcus Stroud.

Log-in records from SnapChat relating to the SnapChat account "sweedprincess" indicate that, between February 9, 2016 and February 22, 2016, "sweedprincess" logged into SnapChat

from an IP address belonging to a "Chris Stroud" in Rockland County, New York. (PSR ¶ 17; Complaint ¶¶ 5, 6).

On February 22, 2016, detectives with CPD interviewed Stroud. Stroud admitted that he was a volunteer wrestling coach and that he knew Victim-1. Stroud said that Victim-1 asked Stroud for help and that Stroud engaged in "computer hacking" in order to help Victim-1. Stroud explained that the "help" required "sending a file" and meeting with Victim-1 to "create the file." When pressed for additional details about the "file" he created, Stroud said that he and Victim-1 engaged in oral sex and recorded the activity on his phone. Stroud said that he then uploaded a virus into the file and sent the file. Stroud stated that he sent the file to the same number that had been texting Victim-1. Stroud stated that he never forced Victim-1 to do anything. (PSR ¶ 18; Complaint ¶ 7; Videotaped Statement ("Video")).

At no point during the approximately-90 minute interview did Stroud admit that he was the person who had posed as a girl and persuaded Victim-1 to take and send the initial sexually-explicit images, or that he was the one who had demanded additional sexually-explicit videos from Victim-1 by threatening to post the previously-sent images on Instagram. Rather, throughout the interview, Stroud maintained that his role in the events had only been to help Victim-1. When asked if the person contacting Victim-1 was male or female, Stroud said that he believed she was a female because "I don't think he's gay so I don't think he'd be trading pictures with another male." Stroud told the detectives that Victim-1 had told him that "she was going to make a page on Instagram about him." Stroud said that he tried to persuade the person not to do it and communicated with "her" via text using a "burner" phone number he obtained through a free App. (Video, Disk 1 at 50:29-52:14).

During the interview, Stroud described the steps he took after making the video to install a virus on the video. (Video, Disk 1, 1:12:29-1:13:50). The detective asked Stroud about the specifics of the request from the girl. Stroud said the request was "that [Victim-1] should get a blow job" and that Victim-1 went to Stroud because of his "hacking skills." (Video, Disk 1, 1:15:01-1:15-47). Stroud said he never "suggested" to Victim-1 that they should have sexual activity. Rather, he told Victim-1 that if he "couldn't find anybody else and needed me, I will." (Video, Disk 1, 1:17:45-1:18:01). The detective asked, "What are the chances that you're the one sending the messages?" Stroud responded, "There is a zero percent chance." The detective asked again, "Would there be any reason for us to find that the original request for the pictures came from you?" Stroud responded, "Nope" and repeatedly maintained that his only involvement was in making the video to help Victim-1. (Video, Disk 1, 1:18:15-1:19:46).

At one point, the detective said, "You did really a big thing for this kid, right?" Stroud replied, "If you could help someone else, you wouldn't?" The detective asked, "Are we going to find out that there were any other wrestling kids or any kids where something like this happened to them?" Stroud insisted that there were no other kids. (Video, Disk 1, 1:29:03-1:29:42).

At the conclusion of the interview, the detectives gave Stroud yet another opportunity to "tell us everything." They emphasized that that they had seen many schemes like the one that occurred with Victim-1 and, in their experience, the individuals who "ride in and save the day" are

often the perpetrators. Stroud insisted, "I am not the person who set him up." (Video, Disk 1, 1:39:15-1:41:55) The detectives underscored that the scheme seemed "way too contrived" and that, ultimately law enforcement computer experts would be able to "connect the dots." (Video Statement, Disk 1, 1:43:35) When the detectives continued to underscore that they were concerned that Stroud was not being completely honest and that he was going to "get caught in a bigger web," Stroud said that he'd like to speak to a lawyer. (Video, Disk 2, 00:00:18-00:00:28).

CPD conducted a search of Stroud's cellphone. The phone contained a video, just under seven minutes in duration, depicting Stroud and Victim-1 engaging in oral sex. (PSR ¶ 19; Complaint 8).

B. The Information & Stroud's Guilty Plea

Complaint 16 MJ 4595 charged Stroud, on July 18, 2016, with sexual exploitation in violation of Title 18, United States Code, Section 2251(a).

On June 5, 2017, Stroud appeared before this Court and pled guilty to a one-count Information pursuant to a plea agreement (the "Plea Agreement") with the Government. The Information charged Stroud with receipt of child pornography, namely, the sexually explicit images of Victim-1 that were transmitted to Stroud from Victim-1 via the internet, in violation of Title 18, United States Code, Section 2252(A)(a)(2)(B).

During the plea proceeding, the Government provided the details of offense conduct. Among other things, the Government explained that Stroud, using alternative online identities, persuaded Victim-1 to take and send sexually explicit photos to Stroud and demanded that Victim-1 make and transmit a video of Victim-1 engaging in sexual activity with another person. The Government described how Stroud then purported to come to Victim-1's rescue, agreeing to "help" Victim-1 by engaging in sexual activity with Victim-1. (Plea Tr. at 19-20). When the Court asked Stroud if he agreed that the Government's rendition of the facts was accurate, Mr. Ser requested that the Court refrain from asking that question because "the details provided by the government goes beyond the complaint." (Plea Tr. at 23). The Court withdrew its question and asked Stroud instead to "tell me in your own words what you did that makes you guilty." (Plea Tr. at 23). Stroud stated, "Via the internet, I received sexually-explicit material showing a minor engaged in masturbation in Rockland County, New York." (Plea. Tr. at 23).

Pursuant to the Plea Agreement, the parties agreed that U.S.S.G. § 2G2.2 applied to the offense and yielded a base offense of 22. The parties agreed that, pursuant to § 2G2.2(b)(5), a five-level enhancement applied because the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor. The parties also agreed that, pursuant to § 2G2.2(b)(6), a two-level enhancement applied because the offense involved the use of a computer for the possession, transmission, receipt, or distribution of the material, or for accessing with intent to view the material. In addition, the parties agreed that, pursuant to § 2G2.2(b)(7)(A), a two-level enhancement applied because the offense involved at least 10 but fewer than 150 images.

The Plea Agreement found that the resulting offense level was 31, but that U.S.S.G. § 2G2.2(c)(1) instructs that, if the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, then § 2G2.1 applies if the resulting offense level is greater than that otherwise determined.

The Plea Agreement determined that, pursuant to U.S.S.G. § 2G2.1(a), the base offense would be 32, two levels would be added pursuant to § 2G2.1(b)(1)(B) because the offense involved a minor who had not attained the age of sixteen years, two levels would be added pursuant to § 2G2.1(b)(2) because the offense involved the commission of a sexual act or sexual contact, and two levels would be added because the offense involved both (A) the knowing misrepresentation of a participant's identity to persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage in sexually explicit conduct and (B) the use of a computer to persuade, induce, entice, coerce, or facilitate the travel of a minor to engage in sexually explicit conduct, or to otherwise solicit participation by a minor in such conduct. Thus, the Plea Agreement found that the offense level pursuant to U.S.S.G. § 2G2.1 would be 38, which is greater than 31.

The Plea Agreement contemplated a three-level reduction for acceptance of responsibility. Thus, the Plea Agreement found that, based on the above, the offense level was 35. The Plea Agreement also found that the defendant had no criminal history points, resulting in his placement in Criminal History Category I. Thus, the Plea Agreement concluded that Stroud's Guidelines range was 168 to 210 months' imprisonment.

C. The Presentence Report and Psychosexual Evaluation

On or about October 25, 2017, the Probation Office issued a Presentence Report ("PSR"). Consistent with the Government's Plea Agreement, the PSR finds an offense level of 35, a Criminal History Category of I, and a Guidelines range of 168 to 210 months' imprisonment.

The PSR recommends a sentence of 144 months' imprisonment. (PSR at p. 19). In making this recommendation, the Probation Office recognizes the existence of various mitigating factors, but underscores that the seriousness of the instant offense and the need for a sentence that will deter the defendant and others "from committing similar acts in the future" requires a significant term of imprisonment.

Dr. Jennifer McCarthy conducted a psychosexual evaluation of Stroud on July 20, 2017. During the interview with Dr. McCarthy, Stroud advised Dr. McCarthy that he "targeted" Vicitm-1 because he found him "very attractive." He admitted that he used a false identity and compromising photos of Victim-1 in order to coerce Victim-1 into engaging in sexual activity. Dr. McCarthy found that the "predatory nature of Mr. Stroud's offense is unquestionable and there is no doubt that his offense was organized and well planned." According to Dr. McCarthy, Stroud "devised such an elaborate plan because he knew that the victim would not have sex with him of his own volition." (PSR ¶ 67).

Dr. McCarthy administered the Abel Assessment for Sexual Interests. The findings suggested that Stroud's significant sexual interests include "grade school males and females, adolescent males and females, and adult males and females." McCarthy Report at 30. In addition, with respect to the Danger Registry, Dr. McCarthy found that "moderate concerns emerged as Mr. Stroud reported having a sexual attraction to and sexual fantasies about having sex with teenage boys. Additionally, severe concerns emerged as he reported having masturbatory fantasies about having sex with teenage boys." McCarthy Report at 33. (PSR ¶ 68).

In her report, Dr. McCarthy found that Stroud's "capacity for relationship stability is questionable, and his antisocial behavior throughout his life demonstrates a lack of concern for others." McCarthy Report at 38. Dr. McCarthy also found that "Mr. Stroud also impresses as narcissistic, antisocial, and manipulative." She concluded that he "has a grandiose sense of self-worth, is criminally versatile, and appears to take pride in some of his criminal activity (e.g., hacking)." Her report concludes, "Further, his expression of victim empathy impresses as disingenuous and self-serving and, based on test results, he continues to engage in abuse-supportive schemes in relation to child molestation." McCarthy Report at 39.

As set forth in the PSR, Dr. McCarthy concluded that, taking into account Stroud's dynamic risk factors and character pathology, Stroud presented an above-average risk of being charged with or convicted of another sex offense. She also diagnosed him with narcissistic personality disorder with antisocial, dependent, and histrionic features and did not rule out a diagnosis of major depression, generalized anxiety disorder, bipolar disorder, pedophilic disorder, or sexual masochism. (PSR ¶ 71).

D. Additional Predatory Sexual Abuse by Stroud

The Government's investigation revealed that the defendant's conduct in connection with Victim-1 was not the first time he had engaged in predatory sexual abuse. From approximately 2012 through 2014, Stroud preyed on another boy ("Victim-2"). According to Victim-2, who was two years and two grades younger than Stroud, Victim-2 met Stroud during a neighborhood game of paintball the summer before Victim-2 entered 8th grade. Victim-2 was 13 years-old. During the game, Stroud offered Victim-2 additional ammunition in exchange for Victim-2 playing a "game" whereby Stroud would touch Victim-2's genital area each time Victim-2 dropped a piece of ammunition. Ultimately, after Victim-2 dropped several pieces of ammunition and Stroud touched and groped Victim-2's penis, Victim-2 ran away from Stroud.

At some point thereafter, Stroud began texting and "skyping" Victim-2 and they played Minecraft together. Eventually, Stroud offered Victim-2 a paying job as an administrator of a server Stroud ran. Victim-2 wanted the job that Stroud offered. Stroud told him that the "application process" required Victim-2 to strip naked on Skype. Stroud directed Victim-2 to "get an erection" and, while Victim-2 displayed himself to Stroud via Skype, Stroud masturbated. Multiple Skype sessions between Victim-2 and Stroud followed over a period of months. When Victim-2 told Stroud he did not want to do it anymore, Stroud threatened to post nude photos of Victim-2 and to ban Victim-2 from his server. Victim-2, who was then in 9th grade, was scared of Stroud and scared of what he might do, so he continued to comply with

Stroud directives. According to Victim-2, at some point during the Skype sessions, Stroud had showed Victim-2 that he was able to access the "darkweb." Victim-2 believed that, if he didn't comply with Stroud's requests, Stroud could use the "darkweb" to hire a hit-man to kill Victim-2.

Then, during the summer after Victim-2's 9th grade year, Victim-2 received communications from a user named "whitegirl202@hotmail.com" on kik.com. That user sent Victim-2 nude photos of women and asked Victim-2 for nude photos of Victim-2 in return. Victim-2 complied with the request. After Victim-2 sent the photos, "whitegirl202" demanded more photos. When Victim-2 refused, "whitegirl202" told him that, if he did not send more photos, the photos he had already sent would be posted on Instagram. That September (2014), when Victim-2 was in 10th grade, Victim-2, not yet realizing that Stroud was "whitegirl202," went to Stroud for help because Victim-2 knew how good Stroud was with computers. Stroud agreed to help Victim-2, but only if Victim-2 either gave him a "blowjob" or permitted Stroud to give Victim-2 a "blowjob." Victim-2 refused.

Soon thereafter, in October, Victim-2 returned home from a Halloween party and discovered that "whitegirl202" had followed his Instagram page and that a "hate page" of Victim-2 had been created and posted on Instagram. The "hate page" consisted of nude photos of Victim-2 posted from an Instagram account with a name along the lines of "You-see-I-told you." Victim-2, now believing that Stroud was behind the nude photos, contacted Stroud. Stroud told Victim-2 that he would have to see him in person in order to help him. In early November, Victim-2 agreed to see Stroud and they met at a field. During that meeting, Stroud grabbed Victim-2's buttocks and put his hands inside Victim-2's pants. Victim-2 told Stroud to get away from him and ran away.

Later that month, Victim-2 learned that a friend of his had received a message via kik.com that appeared to come from Victim-2's kik account, requesting "nudes." In addition, both Victim-2 and his mother received authentic-looking emails that purported to be from law enforcement stating that Victim-2 was known to be in possession of "child pornography accounts." Victim-2 told his parents that he needed to obtain a restraining order against Marcus Stroud and they went to the police. Victim-2 requested a restraining order but declined to provide any details of his dealings with Stroud. According to Victim-2, until his conversations with the Government and the FBI in connection with the investigation of the instant case, he had never told anyone the details of his involvement with Stroud because he was so embarrassed about the things he had done. According to Victim-2, his experience with Stroud was the worst experience of his life and, while it was going on, he contemplated suicide, once even holding a gun to his head.

E. Stroud's Sentencing

On January 23, 2018, the defendant appeared for sentencing. The Government requested a sentence at the high-end of the guidelines' range of 168 to 210 months given the seriousness of the defendant's offense conduct, his hands-on abuse of Victim-1, his history of prior predatory sexual abuse, and his high likelihood of recidivism.

At the sentencing proceeding, the Court addressed the nature and circumstances of the offense, underscoring that "This is one of the most awful offenses one can imagine." (Sentencing Transcript ("Sent. Tr.") at 27). The Court explained, "It wasn't, you know, a gun to his head, but it was psychologically a gun to his head, because he put this child in a position where the child saw no choice but to have sex with this Defendant, and the defendant knew, because he was dealing with a child and because he had set himself up as a trusted older friend and because the whole backdrop was so embarrassing, that this was a kid who was likely to go along rather than think of another way out." (Sent. Tr. at 28). The Court considered the history and characteristics of the defendant, recognizing the existence of certain mitigating factors, such as the fact that the defendant had been abused as child. (Sent. Tr. at 28-32). The Court also recognized the need to protect the public from Stroud (Sent. Tr. at 33).

Ultimately, the Court imposed a sentence of 156 months' imprisonment to be followed by 15 years of supervised release. The Court explained: "Even with the mitigating factors, there just too much pain that this Defendant has caused in a really cold and cruel way and I don't think that the mitigating factors, which absolutely exist, justify a sentence very much below the Guidelines. (Sent. Tr. at 35).

F. The Defendant's Release Motion

The defendant is currently incarcerated FCI Loretto and his projected release date, as posted on the Bureau of Prisons ("BOP") website is May 25, 2027. On August 25, 2020, the defendant, proceeding *pro se*, filed a motion with this Court for compassionate release pursuant to 18 U.S.C. § 3582(c). (Dkt. No. 33). Based on information contained in Stroud's motion and confirmed by the BOP, the Government understands that Stroud made an application for compassionate release on May 27. 2020. On June 9, 2020, the Warden denied the request.

## II. Stroud's Compassionate Release Application Should Be Denied

The defendant's motion should be denied because the Section 3553(a) factors weigh heavily against a reduction in the defendant's sentence and the defendant is a danger to the community as provided in Section 3142(g).

### A. Applicable Law

Under 18 U.S.C. § 3582(c)(1)(A), a district court "may not modify a term of imprisonment once it has been imposed," except under limited circumstances. One such circumstance is the so-called "compassionate release provision," under which Williams seeks relief, which provides that a district court "may reduce the term of imprisonment" where it finds, "after considering the factors set forth in 3553(a) to the extent they are applicable," that "extraordinary and compelling reasons warrant such a reduction…. and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). A motion under this provision may be made by either the BOP or a defendant, but in the latter case only "after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a

motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

The relevant Sentencing Commission policy statement, which appears at U.S.S.G. § 1B1.13, provides that the Court may reduce the term of imprisonment if (1) "extraordinary and compelling reasons warrant the reduction," *id.* § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id.* § 1B1.13(2); and (3) "the reduction is consistent with this policy statement," *id.* § 1B1.13(3).

The Application Note describes the circumstances under which "extraordinary and compelling reasons exist":

(A) Medical Condition of the Defendant. ---

(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is ---
(I) suffering from a serious physical or medical condition,
(II) suffering from a serious functional or cognitive impairment, or
(III) experiencing deteriorating physical or mental health because of the ageing process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant. – The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the ageing process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment whichever is less.

(C) Family circumstances. –

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other reasons. --- As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

*Id.* § 1B1.13 Application Note 1.

Regardless of the theory of "extraordinary and compelling reasons" under which a defendant proceeds, as noted above, the 18 U.S.C. § 3553(a) factors are relevant to whether release is warranted. *See* 18 U.S.C. § 3582; U.S.S.G. § 1B1.13; *United States v. Martinez*, No. 12 Cr. 862 (AJN), 2020 WL 2079542, at *3 (S.D.N.Y. April 30, 2020). A reduced sentence is not available for every defendant who presents "extraordinary and compelling reasons" for a modified sentence. *See* U.S.S.G. § 1B1.13; *United States v. Ebbers*, No. (S4) 02-CR-1144-3 (VEC), 2020 U.S. Dist. LEXIS 3746, at *18-19 (S.D.N.Y. Jan 8, 2020) ("[T]he existence *vel non* of 'extraordinary and compelling reasons' determines only whether a defendant can be considered for release – the existence of such reasons does not mandate release.").

As the proponent of release, the defendant bears the burden of proving that "extraordinary and compelling reasons" exist under the above criteria to justify early release. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("If the defendant seeks decreased punishment, he or she has the burden of showing that the circumstances warrant that decrease."); *United States v.* Clarke, No. 09 Cr. 705 (LAP), 2010 WL 4449443, at *1 (S.D.N.Y. Oct. 29, 2010) (same).

**B. The BOP and COVID-19**

The BOP has made and continues to make significant efforts to respond to the threat posed by COVID-19. Since at least October 2012, the BOP has had a Pandemic Influenza Plan in place. *See* BOP Health Management Resources, https://www.bop.gov/resources/health_care_mngmt.jsp. In January 2020, the BOP began to plan specifically for COVID-19 to ensure the health and safety of inmates and BOP personnel. *See* BOP COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp. As part of its Phase One response, the BOP began to study "where the infection was occurring and best practices to mitigate transmission." *Id.* In addition, the BOP stood up "an agency task force" to study and coordinate its response, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease Control and Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President. BOP's planning is structured using the Incident Command System (ICS) framework." *Id.*

On March 13, 2020, the BOP implemented its Phase Two response "to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." *Id.* These national measures are intended to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." *Id.* For example, the BOP (a) suspended social visits for 30 days (but increased inmates access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case

accommodations); (c) suspended inmate movement for 30 days (with case-by-case exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." *Id.* In addition, the BOP implemented screening protocols for both BOP staff and inmates, with staff being subject to "enhanced screening" and inmates being subject to screening managed by its infectious disease management programs. *Id.* As part of the BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." *Id.*

On or about March 18, 2020, the BOP implemented Phase Three, which entailed: (a) implementing an action plan to maximize telework for employees and staff; (b) inventorying all cleaning, sanitation, and medical sup-plies; (c) making sure that ample supplies were on hand and ready to be distributed or moved to any facility as deemed necessary; and (d) placing additional orders for those supplies, in case of a protracted event. *See* BOP Update on COVID-19, *at* https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf.

On or about March 26, 2020, the BOP implemented Phase Four, which entailed: (a) updating its quarantine and isolation procedures to require all newly admitted inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check (including all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival); (b) placing asymptomatic inmates in quarantine for a minimum of 14 days or until cleared by medical staff; and (c) placing symptomatic inmates in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. *See* BOP COVID-19 Action Plan: Phase Five, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp

On April 1, 2020, the BOP implemented Phase Five, which entails: (a) securing inmates in every institution to their assigned cells/quarters for a 14-day period to decrease the spread of the virus; (b) to the extent practicable, offering inmates access to programs and services that are offered under normal operating procedures, such as mental health treatment and education; (c) coordinating with the United States Marshals Service to significantly decrease incoming movement; (d) preparing to reevaluate after 14 days and make a decision as to whether or not to return to modified operations; and (e) affording limited group gathering to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access. *Id.*

In mid-April 2020, the BOP "began expanding COVID-19 testing of inmates utilizing the Abbot ID NOW instrument for Rapid RNA testing at select facilities experiencing widespread transmission." BOP Expands COVID-19 Testing, https://www.bop.gov/resources/news/20200424_expanded_testing.jsp. "The BOP received ten

Abbot ID NOW instruments on April 10, 2020, and a day later, 264 test kids were deployed to institutions with known COVID-19 cases. Their primary role is for rapid testing of newly symptomatic cases to confirm the diagnosis quickly." *Id.* The BOP is receiving additional Abbott ID NOW instruments. *See id.* "The deployment of these additional resources will be based on facility need to contain widespread transmission and the need for early, aggressive interventions required to slow transmission at facilities with a high number of at-risk inmates such as medical referral centers." *Id.* The BOP's expanded testing "is being conducted in collaboration with public health entities to improve the BOP's ability to manage COVID-19, particularly at facilities experiencing widespread transmission." *Id.*

On April 21, 2020, the Director of the BOP issued a memorandum to inmate families and friends regarding "COVID-19 safeguards." https://ww.bop.gov/resources/news/pdfs/202004211_memo_to_inmate_families_and_friends.pdf . The director explained that "[a]s of April 1, we made the decision that all inmates, in every institution, will be secured in their assigned cells/quarters in order to decrease the spread of the virus. . . . These actions will remain in place until May 18, 2020, at which time they will be reevaluated." *Id.* The Director also noted that "[a] new measure we have implemented in managing the evolving pandemic for institutions with active COVID-19 transmission includes feeding all inmates in their units." *Id.* While acknowledging that these and other measures are "hard on [inmates] and [their] loved ones," the Director stressed that "a]ll of our decisions are made with one goal in mind – keeping everyone safe and healthy." *Id.*

The BOP's current modified operations, which are designed to "maximize social distancing," further belie any suggestion that the BOP is failing to meaningfully address the risks posed by COVID-19 or take seriously the threat the pandemic poses to current inmates. *See* https://www.bop.gov/coronavirus/covid19_status.jsp. Social visits are still suspended. "[I]nmate internal movement is suspended with limited exceptions," including "medical or mental health treatment." *Id.* The BOP and the United States Marshals Service are "coordinating carefully to transport and transfer federal inmates i9nto the Bureau's custody while taking proactive steps, including aggressive testing, to mitigate the transmission of COVID-19 into the federal prison environment. The Bureau is processing all newly-sentenced BOP inmates through one of three quarantine sites – FCC Yazoo City, MS; FCC Victorville, CA; and FTC Oklahoma City, OK, or to a BOP detention center/jail unit. *Id.*. The BOP is "test[ing] all inmates upon arrival at a BOP detention center/jail unit or at one of the three quarantine sites. All inmates [are] tested again before movement to their designated BOP facility." *Id.* Strict screening measures for staff remain in place. *Id.*

Further, the BOP has been reviewing "all inmates who have COVID-19 risk factors, as described by the CDC to determine which inmates are suitable for home confinement," pursuant to the Attorney General's directives. *See* https://www.bop.gov/coronavirus/. Since "the release of the Attorney General's original memo to the Bureau of Prisons on March 26, 2020[,] instructing [the BOP] to prioritize home confinement as an appropriate response to the COVID-19 pandemic, the BOP has placed an additional 7,406 inmates on home confinement." *Id.* Case management staff are urgently reviewing all inmates to make appropriate recommendations, and inmates do not even need to apply to be considered for home confinement. *See* Update on COVID-19 and Home

Confinement, *available at* https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp.

All of these steps belie any suggestion that the BOP is failing to address meaningfully the risk posed by COVID-19 to inmates. To the contrary, they show that the BOP has taken the threat of COVID-19 seriously, has mitigated it, and continues to update policies and procedures in accord with the facts and recommendations. Further, the data shows that FCI Loretto has been successful in preventing the spread of COVID-19. As of today, the BOP has reported that, at FCI Loretto, there are 0 inmates who have tested positive and 7 staff members who have tested positive. There are 59 inmates who have recovered from COVID-19 and one staff member who has recovered from COVID-19. *See* https://www.bop.gov/coronavirus /index.jsp (last viewed; Sept. 1, 2020, at 1 p.m.). On this record, it appears that the BOP is taking and will continue to take measures to protect inmates at FCI Lorretto.

**C. <u>Stroud Has Not Met His Burden of Demonstrating "Extraordinary and Compelling Reasons" to Reduce His Sentence</u>**

In his motion, Stroud who is 23 years old, contends that he is "uniquely threatened" by COVID-19 because he has asthma. (Mot. at 4). Stroud says that he has had asthma since birth and that the "BOP gives Stroud an inhaler to carry with him." (Mot. at 4). Stroud says that, with the inhaler, his asthma is "well-controlled." (Mot. at 4). Based on the Government's review of Stroud's medical records, the Government is aware that the records substantiate the fact that the defendant has asthma and that he uses an inhaler. Nothing in the records suggests that the asthma presents a significant medical issues for him.

Notwithstanding Stroud's asthma, the defendant has not met his burden of demonstrating that he has "extraordinary and compelling" reasons to reduce his sentence. The Government is following the most recent guidance from the Centers of Disease Control ("CDC") in determining whether a medical condition constitutes an extraordinary and compelling circumstance. Current guidance from the CDC does not classify people with asthma as being at high-risk for severe illness from COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical- conditions/html (last visited September 1, 2020). Rather, the CDC's current guidance provides that individuals with "moderate to severe" asthma "might be at increased risk" for severe illness from COVID-19.

Stroud's asthma is well-controlled and treated with an inhaler. Nothing in his medical records suggests that his asthma is "moderate to severe." And, even if it was moderate to severe, it still would not result in classification by the CDC as "high-risk" for severe illness from COVID-19. Accordingly, Stroud has not met his burden of demonstrating "extraordinary and compelling reasons" to reduce his sentence.

**D. The Section 3553(a) Factors and 3142(g) Do Not Justify a Reduced Sentence Here**

The same Section 3553(a) factors that informed this Court's view that a 156-month term of imprisonment was sufficient but not greater than necessary also counsel strongly against his release now. *See* 18 U.S.C. § 3582(c)(1)(A) (requiring courts to conduct a § 3553(a) analysis in considering a compassionate release motion); *United States v. Israel*, 05 Cr. 1039 (CM), 2019 WL 6702522, at *2 (S.D.N.Y. Dec. 9, 2019) (explaining that court confronted with compassionate release motion must "consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances").

At the time of the sentencing proceeding in this case, this Court carefully considered each of the factors under Section 3553(a) – including the "history and characteristics of the defendant," the "nature and circumstances of the offense," the "need for the sentence" "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment of the offense" and "to protect the public from further crimes of the defendant," 18 U.S.C. § 3553(a) -- and imposed a 156-month term of imprisonment. In sentencing Stroud, this Court properly took account of the 3553(a) factors. The original sentence remains just and should not be reduced.

Further, before reducing a defendant's sentence, a court must determine that the "defendant is not a danger to the safety of any person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). In turn, Section 3142(g) directs courts to consider (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). The nature and circumstances of Stroud's offense conduct and the history and characteristics of the defendant (including his prior predatory conduct of Victim-2) make clear that his continued detention for the duration of the original term of imprisonment is necessary to protect the community.

Stroud's release date of May 25, 2027 means that he still has almost seven years of his sentence left to serve. Numerous courts have denied motions for compassionate release, even where a defendant had qualifying health conditions, when the defendant had served only a portion of the otherwise appropriate sentence. *See, e.g., United States v. Seshan*, 14 Cr. 620 (JFK), 2020 WL 2215458, at *4 (S.D.N.Y. May 6, 2020) (denying release for defendant who served less than six years of ten-year sentence); *United States v. George*, 19 Cr. 171 (KMK) (S.D.N.Y. May 5, 2020) (Dkt. No. 45 at 3) (denying release in part because the defendant "has served a small percentage of his sentence"); *United States v. Randy Martinez*, 12 Cr. 862 (AJN) (S.D.N.Y. April 28, 2020) (Dkt. No. 469 at 6) (denying release when defendant had one year remaining in approximately ten-year sentence). The 156-month sentence originally imposed by this Court appropriately addresses Stroud's serious criminal conduct. Justice would not be served by releasing him now. *See, e.g., United States v. Butler*, 18 Cr. 834 (PAE), 2020 WL 1689778 (S.D.N.Y. Apr 7, 2020) (denying motion for compassionate release in light of COVID-

19 for defendant with asthma and heart condition where defendant was a danger to the safety of others and had only served 15 months of 60-month sentence); *United States v. Credidio*, 19 Cr. 111 (PAE) (S.D.N.Y. March 30, 2020) Dkt. 62 (denying motion for compassionate release and reduction of sentence to home confinement in light of COVID-19 pandemic for a 72-year-old defendant sentenced in Feb. 2020 to 33 months' imprisonment because the lengthy term of imprisonment was required for reasons given at sentencing); *United States v. Gil*, 90 Cr. 306 (KMW), 2020 WL 2611872 (S.D.N.Y. May 22, 2020) (denying motion for compassionate release for 70-year-old defendant where, despite existence of pre-diabetes, hypertension, hyperlipidemia, and latent tuberculosis, the defendant posed a danger to the community).

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that Stroud's motion for release pursuant to 18 U.S.C. § 3582 should be denied.

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney

By: ______________________________

Marcia S. Cohen
Assistant United States Attorney
(914) 993-1902

cc: by mail to Marcus Stroud
FCI Loretto
P.O. Box 1000
Cressen, PA 16630